# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# DURHAM DIVISION

Case No. _____

| | |
|---|---|
| TOUCHLINE VIDEO, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | COMPLAINT |
| v. ) | |
| ) | |
| THE INTERCOLLEGIATE ) | |
| WOMEN'S LACROSSE COACHES ) | |
| ASSOCIATION (IWLCA) ) | JURY TRIAL DEMANDED |
| ) | |
| Defendant. ) | |

## INTRODUCTION

Plaintiff Touchline Video, Inc. ("Touchline") for its Complaint against Defendant the Intercollegiate Women's Lacrosse Coaches Association, Inc. ("IWLCA") alleges and states as follows.

This is a case of breach of contract and unfair unjust enrichment. Touchline and IWLCA entered into a valid, binding, and enforceable contract on June 26, 2018 ("2018 Contract"), extending a long-standing business relationship dating back to 2012. Less than two years into the five-year term of the agreement, Defendant IWLCA initiated a scheme to usurp Touchline's business, by unilaterally modifying material terms of the contract and manufacturing baseless reasons to terminate Touchline. Despite acknowledging Touchline's good performance under the contract, IWLCA unilaterally and wrongfully terminated the contract years before completion of its full term. IWLCA's unjustified breach has caused and will continue to cause Touchline to suffer significant damages.

1

## PARTIES

1. Touchline is a Nevada corporation with its principal place of business located at 790 McCurdy Rd. White House, TN 37188250.

2. IWLCA is a Maryland corporation with an office located at 4501 N. Charles Street, Baltimore, MD 21210.

3. IWLCA is also registered to conduct and does conduct business in North Carolina, pursuant to a Certificate of Authority for Nonprofit Corporation. IWLCA's North Carolina principle office is identified as the offices of Ekstrand & Ekstrand, LLP, 110 Swift Avenue, Second Floor, Durham, North Carolina 27705.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds $75,000, exclusive of interest and costs, and there is diversity of citizenship between the Parties.

5. This Court has personal jurisdiction over IWLCA because IWLCA has substantial contacts in this district by, among other things, maintaining a place of business in the district and purposefully availing itself of the benefits and protections of North Carolina law by regularly conducting business in this State and being registered to conduct business in this State. In addition, the breaching conduct of IWLCA occurred in this district.

6. IWLCA also agreed, in the 2018 Contract between the Parties, to be subject to jurisdiction in North Carolina, and has therefore waived any challenge to personal jurisdiction in this Court.

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events giving rise to the claims arose within this judicial district, IWLCA conducts business within this judicial district, and because IWLCA maintains a place of business within this district.

8. IWLCA also agreed, in the 2018 Contract between the Parties, that venue in this Court is proper, and has therefore waived any challenge to venue in this Court.

## FACTUAL ALLEGATIONS

**Overview**

9. Since its humble beginnings operating out of a garage in California in 2009, Touchline Video has grown to become the nation's largest video production company specializing in youth sports. Each year, Touchline records thousands of matches from the most prestigious youth sports events.

10. For almost ten (10) years, Touchline successfully partnered with IWLCA to provide video production services for IWLCA-sponsored women's lacrosse tournaments across the country.

11. Before Touchline partnered with IWLCA, there were little to no options for generating high quality videos of all matches for women's lacrosse tournaments. Touchline changed that, developing the platform and systems needed to successfully capture video from the dozens or hundreds of games at each tournament, and packaging the video for teams or individuals to enjoy.

12. During their successful partnership, both Parties prospered, and the coaches and teams benefitted from access to high-quality game video from the various

3

tournaments. That success and confidence in Touchline resulted in the 2018 Contract that extended and bound the Parties to a relationship for five years.

13. In early 2020, IWLCA changed leadership, including at the Executive Director level, and those new leaders resented Touchline's contractual agreement with IWLCA, sought to unilaterally modify the contract, and began manufacturing issues in an effort to evade its contractual responsibilities to Touchline.

14. During the 2020 tournament season, the new IWLCA leadership complained about its contract with Touchline, alleged that the "market" for tournament videos expanded or changed for all those involved; informed Touchline it was exploring a business relationship with a recruiting platform company that would host IWLCA's tournament videos; and proposed one-sided, unreasonable terms inconsistent with the Parties' negotiated business arrangement.

15. IWLCA's conduct occurred despite its acknowledgment that the Parties were successful partners, including in a 2020 letter: "The IWLCA and Touchline Video have had a good working relationship for close to 10 years."

16. Nevertheless, IWLCA unilaterally terminated the agreement and cut off Touchline's access to tournaments, citing purported breaches by Touchline of requirements found nowhere in the Parties' agreement.

17. From the outset of this dispute, Touchline has attempted to resolve this matter in good faith and on reasonable terms, even agreeing to renegotiate the signed 2018 Contract between the Parties despite having no obligation to do so. IWLCA rebuked

those efforts and chose instead to terminate the Contract without any justification or cause, thereby themselves breaching the agreement and damaging Touchline.

**History of Touchline and IWLCA's Partnership**

18. IWLCA is a professional association comprised of women's lacrosse coaches within Division I, II & III of the National Collegiate Athletic Association (NCAA), and the National Association of Intercollegiate Athletics (NAIA).

19. In or around 2012, Touchline began conversations with Gothard Lane, the IWLCA's then-Executive Director, regarding Touchline providing video recording services for lacrosse tournaments sponsored by IWLCA.

20. Touchline and IWLCA reached an agreement whereby Touchline would provide high quality video recordings of recruiting tournaments for high school-age girls' club lacrosse teams, including "The Champions Cup," "The Capital Cup," "The New England Cup," "The Summer Debut," "The Fall Debut," "The Midwest Cup," and "The Presidents Cup" (collectively, the "Tournaments").

21. Under the original arrangement, Touchline would attend every game played in each of the Tournaments and record the games in their entirety. Touchline would bear its own costs related to the recording and processing of videos including, equipment, supplies, maintenance, repairs, employees, travel, and other costs as needed.

22. In 2014, the Parties better defined their working relationship through a written contract specifying more precisely how the Parties would perform ("2014 Contract"). The 2014 Contract was for a term up through 2018. Touchline and IWLCA

5

performed according to the terms of this 2014 Contract through the 2018 tournament season to the mutual benefit of both Parties.

**The Touchline-IWLCA 2018 Contract**

23. In June 2018, the Parties executed the new 2018 Contract similar in most respects to the 2014 Contract but with some mutually agreed upon modifications. In the 2018 Contract, Touchline agreed to continue providing high quality video recordings of the Tournaments for five years, up to and including the 2023 tournament season, pursuant to certain payment and other terms from IWLCA, after which the Parties could renew the Contract if desired. A true and correct copy of the 2018 Contract is attached as **Exhibit A.**

24. More particularly, the 2018 Contract provided, among other things, that Touchline would:

    a. Work in a timely and professional manner with the online hosting company contracted by IWLCA for expeditious uploading of Tournament recordings;

    b. Offer a collection of team game recordings at a discounted rate of $300.00 to each Tournament participating team whose club has registered for the "video choice option." For the club teams that did not register for the "video choice option," Touchline would offer a collection of individual game recordings at its prevailing rate;

    c. Make the Tournaments a priority commitment both before and during each Tournament, and take all reasonably available steps to provide the highest quality of video recordings for the Tournaments in a timely manner, maintaining the

reputation of the Tournaments as the premiere, best-run club lacrosse tournament in the market;

    d. Offer preferred discounted rates for all of its packages exclusively for IWLCA Tournaments compared to the rates Touchline offers for other high school-age girls' lacrosse tournaments; and

    e. provide its "Highlight Package" to Tournament participants at a rate in its discretion.

25. The 2018 Contract also memorialized IWLCA's promises to, among other things:

    a. pay Touchline $100.00 per registered team for Touchline's professional services of recording each Tournament when IWLCA sold its own packages;

    b. pay Touchline an additional $100.00 per club team for each club team that elected the "video choice option" in exchange for Touchline providing eligible participants with the compilation of individual game recordings. IWLCA would not pay Touchline for any club teams not electing the "video choice option";

    c. communicate with Touchline on a regular basis throughout the year and respond in a timely fashion to Touchline's questions and requests for information (*e.g.*, participant contact information, team roster information, etc.).

26. Touchline also sold videos to individual teams, coaches and parents who purchased videos directly from it.

27. The 2018 Contract also provides a mechanism for the Parties to modify the 2018 Contract's terms, if mutually desired. Any modification of the 2018 Contract "must

be made in writing and signed by both Parties." Additionally, "[w]aiver of any default, breach, or failure to perform" is not considered a modification of the 2018 Contract.

28. Neither party has the unilateral right to modify the 2018 Contract.

29. Neither party has the unilateral right to terminate the 2018 Contract for convenience.

30. The 2018 Contract does not include a termination provision.

31. Touchline and IWLCA each performed under the 2018 Contract during the 2019 tournament season to the Parties' mutual benefit. Indeed, both Parties profited from the relationship and Touchline relied on the work with IWLCA as a big part of its business. Other than 2020 due to Covid-19 pandemic, Touchline's profits had increased each year by approximately 7.5%.

**IWLCA's Attempts to Unilaterally Modify the 2018 Contract**

32. In or around January 2020, IWLCA appointed a new Executive Director, Elizabeth Robertshaw, replacing IWLCA's previous executive director, Gothard Lane.

33. Following Ms. Robertshaw's appointment as Executive Director, IWLCA informed Touchline that it was reviewing its 2018 Contract with Touchline.

34. In April 2020, citing the COVID-19 pandemic, IWLCA withdrew its sponsorship of the 2020 tournaments. Touchline proceeded with its participation in the tournaments, with IWLCA's knowledge and approval, that were run by IWLCA's tournament partner, Corrigan Sports Enterprises, Inc. ("CSE"). Because of the unique circumstances of covid, CSE decided to give game film away to players, teams, and coaches for free.

35. During the summer of 2020, IWLCA raised concerns about its working relationship with Touchline and reached out to discuss decisions IWLCA had made regarding companies to be involved in the 2021 tournaments.

36. IWLCA complained to Touchline that the market rates for video production had allegedly changed, and that IWLCA felt Touchline was getting an unfair deal. Contrary to IWLCA's position, the market rate had increased for videos and video services not decreased; Touchline was giving IWLCA a great deal.

37. In August and October 2020, Touchline's president, Mr. Bill Shannon, met multiple times with Ms. Robertshaw to discuss these purported changes in the market for tournament video recordings, and IWLCA's contention that Touchline was benefiting from a more profitable agreement than others. None of these assertions were true and Mr.

9

Shannon explained how the costs for video production and services had and would likely increase.

38. In particular, IWLCA complained that others in the market were giving free video access to student-athletes, rather than charging for access as agreed to in the 2018 Contract.

39. IWLCA also complained that IWLCA was not receiving any commission on Touchline's video sales—a payment that IWLCA contended had become an "industry norm," but which is not an industry norm, and more significantly was not provided for or required under the 2018 Contract. IWLCA never provided evidence or information to substantiate this contention.

40. Touchline made clear to IWLCA that if it was forced to provide tournament video at no cost to participants going forward, contrary to its 2018 Contract with IWLCA, Touchline would lose profits estimated at over $300,000.00 annually.

41. IWLCA acknowledged the contractual payment obligations and indicated that it would not offer its tournament video at no cost to participants.

42. IWLCA also introduced a third-party recruiting company, SportsRecruits, into these discussions. IWLCA asked Touchline to coordinate with SportsRecruits to provide video via SportsRecruits for the 2021 tournaments.

43. SportsRecruits is a recruiting platform and has its own video subsidiary, Cross Street Sports (crossstreetsports.com).

44. Because IWLCA demanded that Touchline work with SportsRecruits and provide videos through their platform, Touchline did so. Touchline was contractually

10

Case 1:21-cv-00858-TDS-LPA   Document 1   Filed 11/05/21   Page 10 of 20

obligated to coordinate with SportsRecruits, but only to upload video and did not expect or agree that this would be a permanent modification to the 2018 Contract without other consideration and changes to which both Parties would mutually agree.

45. In November 2020, IWLCA attempted to unilaterally modify the 2018 Contract, insisting that "[i]f Touchline Video desires to continue to work with IWLCA and film [its] recruiting tournaments," Touchline must "confirm a few of the rights" under the 2018 Contract.

46. IWLCA asserted multiple points purportedly "to clarify and confirm a few of the rights, responsibilities, and restrictions under [the] 2018 Contract."

    a. IWLCA asserted that where Touchline sells its "Video Select Option" to a tournament team for $300.00, IWLCA receives $200.00 and Touchline receives $100.00. But, this was never part of the 2018 Contract or relationship between the Parties. Touchline was never required to or did pay IWLCA. In fact, the opposite was true where IWLCA would pay Touchline for orders made to IWLCA, and Touchline could and did sell the videos to its own customers without any obligation to pay IWLCA.

    b. IWLCA demanded for the first time that Touchline could host tournament videos on "another site" but access must be limited to IWLCA coaches. Again that was never part of the 2018 Contract and was contrary to years of practice with Touchline selling videos on a different platform.

    c. IWLCA asserted that Touchline does not have a license to provide IWLCA "[t]ournament film to any platform or company for any additional access beyond

11

IWLCA coaches or for cost without the IWLCA written permission." As stated above, this was neither part of the 2018 Contract nor the practice of the Parties.

47. These purported requirements are not and never were a part of the 2018 Contract and were never agreed to by Touchline. Rather they were new conditions IWLCA sought to impose on Touchline as a way to vastly restructure the relationship or bully Touchline into ending the 2018 Contract.

48. As but one example, Touchline had for years displayed videos and order forms on ConnectLAX, a platform for which Touchline had long used to take payments and process videos. IWLCA was well aware of this process, had authorized Touchline to use it and had no problem with the use of ConnectLAX platform to host its video order and payment processing services that was a better experience for participating teams. Prior to IWLCA's November 2020 letter, IWLCA had never complained about Touchline's use of ConnectLAX as its platform or stated that Touchline couldn't use ConnectLAX as the method of making sales to Touchline's customers. For years and years, this is how Touchline sold its videos to its own customers, i.e. either a coach, parent or team who ordered from Touchline directly.

49. ConnectLAX is a direct competitor of SportsRecruits.

50. In December 2020, Touchline informed IWLCA that it had noted IWLCA's concerns regarding the 2018 Contract and that its goal was to continue the business relationship to the mutual benefit of the Parties.

51. Further, despite having no obligation to do so, Touchline also agreed to try to re-negotiate the 2018 Contract to ensure that the Parties would have a "positive working relationship into the future."

52. To that end, on December 9, 2020, Touchline provided IWLCA with a proposed new agreement to provide IWLCA coaches with access to tournament video recordings, a substantial discount to the players and teams, while maintaining Touchline's ability to meet its obligations under the agreement and reasonably profit from its work as it had in the past.

53. IWLCA rejected the December proposal without even attempting to negotiate any modifications.

54. Instead, IWLCA presented Touchline with its own proposed "addendum" to the 2018 Contract that included significant new terms and imposing unreasonable obligations on Touchline; specifically, among other things, an unrealistic 72 hour video upload requirement, and a provision precluding Touchline from using a third-party platform to sell certain authorized Tournament video (which Touchline had done throughout the Parties' relationship).

55. Once again, despite having no obligation to do so, but in a good faith effort to maintain the relationship between the Parties, Touchline considered the addendum, and proposed modifications that would be acceptable to Touchline. However, IWLCA had no interest in negotiating the addendum, and instead insisted Touchline agree to IWLCA's new terms as presented.

56. Touchline could not agree to IWLCA's new terms, nor was it obligated to do so.

57. What became clear, is that despite Touchline's repeated assurances that it would meet its obligations under the 2018 Contract, and its willingness to re-negotiate or add an addendum to the 2018 Contract, or in the alternative, enter into a new contract with IWLCA, despite having no obligation to do so, IWLCA's new leadership intended from the outset to manufacture a pretextual basis for terminating the 2018 Contract so it could hire a new video vendor with more favorable payment terms.

58. IWLCA continued its improper acts and accusations to further sabotage the relationship. On April 5, 2021, while Touchline was attempting to negotiate IWLCA's proposed addendum, IWLCA sent a cease and desist letter to ConnectLax, Touchline's third-party video sales vendor, alleging trademark infringement stemming from its use of IWLCA trademarks posted by Touchline through its authorized sale of Tournament videos.

59. ConnectLAX had not infringed IWLCA's trademarks but was promoting the tournament videos as IWLCA had approved for years. Eventually, under IWLCA's threats and bullying tactics, ConnectLAX capitulated and stopped promoting IWLCA events and videos on its site.

60. Subsequently, on April 20, 2021, following Touchline's refusal to accept IWLCA's one-sided and unreasonable "Addendum" to the 2018 Contract, IWLCA wrote Touchline again stating that too many points of disagreement remained regarding the Addendum. Nevertheless, and noting the Parties' "productive and longstanding working

relationship," IWLCA confirmed that it would move forward with Touchline under the terms of the 2018 Contract for the 2021 Tournaments, subject to certain unilateral "clarifications."

61. The letter demanded that Touchline affirm in writing that it would agree to several terms, each of which went beyond the scope of Touchline's obligations under the 2018 Contract. Touchline refused to agree to IWLCA's unreasonable terms, but again confirmed it would abide by the terms of the 2018 Contract.

62. IWLCA's proposed additional unilateral modifications including, among others, that Touchline follow a purported "market standard" for tournament video recording upload, a requirement absent from the 2018 Contract. IWLCA's proposed "market standard" would require that Touchline upload processed game film within 3-5 days after the end of the game. IWLCA's letter also noted it expected Touchline to upload the processed game film "on the shorter end" of the time frame. There was and is no market standard in this regard. In fact, contracts with large events prove the opposite where video processing takes place anywhere from six or seven to fifteen days after an event. IWLCA did not and does not have evidence to support this unreasonable and unsupported condition.

63. Between April 2021 and June 2021, in an effort to maintain a positive relationship, Touchline assisted SportsRecruits with tournament video recording transfers at the request of IWLCA in a manner and scope that went way beyond any contractual obligation to do so. Touchline expected that its cooperation and assistance would lead to an ongoing relationship with IWLCA for the term of the 2018 Contract.

64. During this time, Touchline not only uploaded a significant amount of tournament video recording files to the SportsRecruits video repository, but it also made itself available to respond to questions and issues from the SportsRecruits team. This constituted numerous man hours for which Touchline would normally be paid.

65. Touchline received no compensation for its additional time and effort expended on supporting SportsRecruits.

66. In September 2021, following successful completion of some, but not all, of the 2021 Tournaments, IWLCA unilaterally and wrongfully terminated the 2018 Contract based on false assertions about and proposed modifications to the 2018 Contract, modifications to which Touchline never agreed (the "Termination Letter").

67. IWLCA did not have legitimate grounds to terminate the 2018 Contract. The Termination Letter incorrectly stated that Touchline materially breached the 2018 Contract when in fact Touchline had complied with its contractual obligations and had never agreed to IWLCA's unilateral modifications.

68. For example, the Termination Letter accused Touchline of "late" delivery of video because it was provided more than 72 hours after completion of the tournament. The 2018 Contract includes no 72-hour delivery requirement.

69. Further, following the New England Cup tournament, Touchline informed IWLCA of unexpected small delays in video delivery stemming from unexpected airline cancellations. IWLCA's Ms. Robertshaw stated that IWLCA "totally understood," and noted that she, too, had "been victim to some of those delays and cancellations recently."

16

70. In September, 2021, IWLCA completed the scheme it had initiated in 2020 to wrongfully get out of the five-year contract it had entered into with Touchline, forcing Touchline to consult for and make SportsRecruits a viable video platform, and taking Touchline's business. Just as it had with other IWLCA vendors, IWLCA used its lawyers and bullying tactics to terminate and cause harm to Touchline while trying to "paper the record" with self-serving letters and communications IWLCA kept trying to insert as contract terms. IWLCA's Board and directors either did not know (but should have known) of such conduct and decisions, or they knew of, and were complicit in these wrongful acts.

## COUNT I
## Breach of Contract

71. Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

72. The 2018 Contract constitutes a valid, legally binding, and bargained for contract between Touchline and IWLCA that required IWLCA to partner with Touchline for video services for a five-year term.

73. Touchline has fulfilled all of its obligations under the 2018 Contract. At no point did Touchline breach the 2018 Contract or was it unable to provide the services as required by the 2018 Contract.

74. As described above, IWLCA failed to perform under the 2018 Contract. IWLCA materially breached the 2018 Contract by unilaterally terminating the 2018 Contract without cause.

17

75. The terms of the 2018 Contract governed the relationship until it was wrongfully terminated in 2021, and the Parties had a valid and legally binding agreement at all relevant times according to the terms of the 2018 Contract.

76. IWLCA's wrongful breach of the 2018 Contract, including but not limited to IWLCA's failure to perform and pay Touchline pursuant to the 2018 Contract and IWLCA's cancellation of the 2018 Contract following Touchline's disagreement with IWLCA's non-negotiated terms, was the direct and proximate cause of damages to Touchline.

77. Touchline's damages resulting from IWLCA's breach of the 2018 Contract include, among other things, its lost revenues stemming from IWLCA's breach.

78. As a direct, proximate, and foreseeable result of IWLCA's breaches of the 2018 Contract, Touchline has been damaged in an amount to be proven at trial.

## COUNT II
## Unjust Enrichment

79. Touchline incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

80. Touchline has provided measurable benefits to IWLCA through its provision of consulting to, and assistance with SportsRecruits for the benefit of IWLCA. Such assistance went well beyond any obligation to assist in uploading videos, including instruction and training, consulting, troubleshooting, and helping to establish SportsRecruits as a viable platform.

18

81. Touchline was not contractually obligated to provide such services to SportsRecruits for IWLCA and SportsRecruits was not used by IWLCA at the time of the 2018 Contract.

82. Touchline did not confer these benefits officiously or gratuitously. Rather, Touchline conferred these benefits with the expectation that it would be compensated for them.

83. IWLCA expected and accepted the benefits provided by Touchline.

84. It would be inequitable to allow the IWLCA to retain the benefits of these services without paying Plaintiff just compensation for that work.

85. IWLCA has been unjustly enriched in an amount to be determined at trial.

## JURY DEMAND

Touchline requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Touchline Video, Inc. prays that this Honorable Court enter judgment in its favor and against IWLCA on all counts of Plaintiff's Complaint as follows:

A. Declare and find that IWLCA breached its contract with Touchline;

B. Declare and find that IWLCA has been unjustly enriched;

C. Award Touchline all its compensatory damages caused by IWLCA's wrongful and unlawful acts;

D. Award Touchline interest, including pre- and post-judgment interest;

E. Order that the costs of this action be taxed against IWLCA; and

F. Such other and further relief as the Court deems just and proper.

Respectfully submitted this 5th day of November, 2021.

By: */s/ Robert C. Van Arnam*
Robert C. Van Arnam (N.C. Bar No. 28838)
Andrew R. Shores (N.C. Bar No. 46600)
Carmelle F. Alipio (N.C. Bar No. 54738)
**WILLIAMS MULLEN**
P.O. Box 1000
Raleigh, NC 27602-1000
Telephone: (919) 981-4000
Fax: (919) 981-4300
rvanarnam@williamsmullen.com
ashores@williamsmullen.com
calipio@williamsmullen.com

*Attorneys for Plaintiff*